Hillsborough, }
Nov. 2, 1909. }

## HUSKIE *v.* GRIFFIN.

One who makes false statements concerning a servant for the purpose and with the effect of depriving him of employment is liable to him for the damage resulting therefrom.

A statement of the truth, made for the sole purpose of injuring a person by causing a third party to refuse to further deal with him, is actionable if damage ensues.

The fact that a person interfering with another's employment was actuated by malice may be inferred from the proved absence of other motive for the act complained of, or may be affirmatively shown in case a justifiable cause is alleged.

In the absence of fraud or malice, one charged with an unlawful interference with another's employment may justify his conduct by showing that it was reasonable under all the circumstances; and the question of reasonableness is one of fact for the jury.

CASE, for interfering with the employment of the plaintiff in the McElwain shoe factory. Trial by jury. At the close of the plaintiff's evidence a nonsuit was ordered, subject to his exception. Transferred from the January term, 1909, of the superior court by *Plummer*, J.

The plaintiff's evidence tended to prove that while he was employed by the defendant he applied for an increase of wages and was told by the defendant's superintendent that he was at liberty to leave at any time if he could better himself. He sought employment elsewhere and one day received a note stating that he could have work at the McElwain factory. He showed the note to Griffin's superintendent, who made no objection to the proposed action, but at once went to the office and drew the plaintiff's wages for him. As soon as the plaintiff had left, Griffin telephoned to Trull, superintendent of the McElwain shop. Trull's testimony as to the conversation with Griffin was in part as follows:

"He telephoned and said there was a man from my factory came up to his factory with a note and hired, or was about to hire, one of his men, right in the middle of the day, and wanted to know if I thought that was a nice thing to do. I said it was not, and that I would not hire the man; and when I found out about it I told our man not to hire him."

Q. "That is, you instructed your agent not to hire him?" A. "Yes, sir; but after that Griffin told me I could hire him, but I told him I didn't want him."

Q. "That was a little ironical, wasn't it, Mr. Trull?" A. "Well, during the same conversation, right afterward, he said 'You can have him if you want him, you can hire him.'"

Q. "And you understood that to be a little ironical, didn't you?" A. "I didn't understand anything about it."

Q. "Well, you didn't hire him, anyhow?" A. "No, sir; I didn't hire him."

On cross-examination the witness stated the conversation more favorably to the defendant.

When the plaintiff reached the McElwain factory he was refused employment. He then returned to the defendant, who complained because the plaintiff received a note in the shop. The conversation became heated, and the defendant refused to comply with the plaintiff's request to telephone to Trull and adjust the matter.

*David W. Perkins* (by brief and orally), for the plaintiff.

*Burnham, Brown, Jones & Warren* (*Robert L. Manning* orally), for the defendant.

PEASLEE, J.    The parties to this action do not agree as to what facts the evidence tended to prove.    The defendant argues that because he asked Trull to retain the plaintiff as an employee, therefore it cannot be found that the defendant sought to cause the plaintiff's discharge by Trull.    The plaintiff's claim is that the request to retain him might be found to be a mere cover, well understood by both parties to the conversation.    His claim is well founded.    A jury might believe that the complaint made by the defendant to Trull was false, and that the defendant, after he had encouraged the plaintiff to seek employment elsewhere, maliciously caused the plaintiff's discharge from such new employment.

The plaintiff's engagement was not for any certain period. Trull might lawfully discharge him at any time.    It therefore follows that cases involving recovery for procuring the breach of a binding executory contract (*Bixby* v. *Dunlap*, 56 N. H. 456; *South Wales Miners' Fed.* v. *Coal Co.*, [1905] A. C. 239) are not in point here.    The issue presented is that of the existence and extent of what has come to be known as the right to an " open market." How far one may lawfully interfere to prevent the making of contracts between third parties is a problem which has been much discussed in other jurisdictions.    It is new in this state.    Three phases of it are presented by the case at bar: (1) When the interference is by fraud; (2) when it is without fraud or force (actually applied or reasonably apprehended), but prompted by a motive to injure the aggrieved party; (3) when it is unaccompanied by what are ordinarily considered illegal acts or motives, and is induced solely by a desire of the defendant to promote his own welfare.

1. It is well established that the inherent right of every man to freely deal, or refuse to deal, with his fellow-men is not to be destroyed or abridged by acts involving the elements of the common-law action for deceit.    This is not denied.    On this branch of the case the defendant relies upon the proposition that the facts are not made out.    He concedes, as he plainly must concede, that the law is in favor of the plaintiff's position, provided only that there is evidence to support the several necessary findings.

As before stated, there was evidence in this case which, if believed by the jury, would lead to the conclusion that the defendant was guilty of fraud.    It could be found that the plaintiff quit

the defendant's employ in an honorable manner; that the defendant, with knowledge of the facts, represented that the plaintiff's departure was dishonorable; that this was done with the intent to cause the new employer to act to the plaintiff's damage; and that such damaging action resulted from this cause. The plaintiff was entitled to go to the jury upon the issue of fraud.

2. Whether motive (when falsehood is absent) is a material element in these cases is a question upon which the authorities are not so fully agreed. That it is material, and that where malice, or a purpose to do the plaintiff injury, is the moving force to the commission of the act, a recovery may be had, is the rule in many jurisdictions. *Plant* v. *Woods,* 176 Mass. 492; *Van Horn* v. *Van Horn,* 56 N. J. Law 318; *Doremus* v. *Hennessy,* 176 Ill. 608; *Ertz* v. *Produce Exchange,* 79 Minn. 140; *Bowen* v. *Hall,* 6 Q. B. Div. 333.

The rule is well stated in a recent case in California. " Any injury to a lawful business, whether the result of a conspiracy or not, is *prima facie* actionable, but may be defended upon the ground that it was merely the result of a lawful effort of the defendants to promote their own welfare. To defeat this plea of justification, the plaintiff may offer evidence that the acts of the defendants were inspired by express malice and were done for the purpose of injuring the plaintiff, and not to benefit themselves. The principle is the same which permits proof of express malice to defeat the plea of privilege in libel, or the defence of probable cause in actions for malicious prosecution or false imprisonment." *J. F. Parkinson Co.* v. *Trades Council,* 154 Cal. 581. The opposite view is taken by high authority. *Macauley* v. *Tierney,* 19 R. I. 255; *Bohn Mfg. Co.* v. *Hollis,* 54 Minn. 223; Judge Jeremiah Smith in 20 Harv. Law Rev. 451, *et seq.*

For the reason above indicated and others which will be given in the discussion of the next issue in this case, it is held that a statement of the truth, made for the sole purpose of damaging the plaintiff by causing a third party to refuse to further deal with the plaintiff, is actionable if damage ensues.

The state of mind of an offending person may be proved in various ways. It may appear that there was no good reason for doing the act. In that case malice may be inferred from the proved absence of other motive for the act done. In case there be a sufficient justifiable motive, it may still be proved that in fact malice was the moving force. In either case the question is one of fact.

There was in the case at bar sufficient evidence to support a finding that the defendant did what he did for the sole purpose of depriving the plaintiff of the benefit of a contract for employment.

The question is not what the defendant now says his purpose was. It is not even what he said his purpose was at the time he made the complaint to Trull. Nor is his motive necessarily to be found in a literal application of the words he used. The conversation as testified to was susceptible of more than one interpretation. It may have meant that the defendant intended to cause the plaintiff to be discharged as a matter of small revenge, and while the defendant was formally protesting against the act he had intentionally and maliciously caused. It is not, as the defendant claims, a case of guessing. It is one of interpreting the acts and words disclosed by the evidence in the case. Upon this issue the case should have been submitted to the jury, under instructions that if they found the act was done solely for the purpose of injuring the plaintiff he was entitled to recover. If the damage was done " for its own sake," liability would be made out. *Vegelahn* v. *Guntner*, 167 Mass. 92, dis. op. of *Holmes*, J.

3. Beyond the issues of fraud and malicious injury lies one which has caused much of perplexity and conflicting adjudication. How far advantage may or may not lawfully be gained by appeal, persuasion, or threat of loss of future favor,—whether those not involved in the initial contest may be dragged into it by these and kindred means,—are questions which courts, jurists, and publicists have not found it easy to answer. Between the early view that a peaceful strike for higher wages was inherently wicked (*King* v. *Journeymen Tailors of Cambridge*, 8 Mod. 11; *In re Journeymen Cordwainers*, Yates Sel. Cas. 111, 277) and the theory that all honest and peaceful means are permissible (dis. op. *Vegelahn* v. *Guntner*, *supra*) there is room for every shade of opinion. "It will be seen that in the different courts there is considerable variety and some conflict of opinion." *Berry* v. *Donovan*, 188 Mass. 353.

Cases where the act complained of was committed by one person alone are comparatively rare, the plain reason being that peaceful and truthful persuasion, or promise of future favor, by a single individual is not likely to produce results of a character so grave as to induce the injured party to seek redress through the courts. But when the act is that of many persons, the result has not infrequently been to drive the injured party out of business or deprive him of an opportunity to labor at his chosen calling. In many cases it has been decided that the common law governing criminal conspiracies offered a sufficient ground for holding the offenders liable civilly. *Lohse Patent Door Co.* v. *Fuelle*, 215 Mo. 421, and authorities there reviewed. It was soon perceived, however, that the argument was unsound; and the theory that acts which might lawfully be done by one or any num-

ber of persons, acting singly, were unlawful when done by several acting by a concerted plan, was abandoned in most jurisdictions. *Boutwell* v. *Marr*, 71 Vt. 1; *Toledo etc. Ry.* v. *Company*, 54 Fed. Rep. 730.

Another ground taken was that there is in the concerted action of the many a coercive element which should be placed on a par with the use of force, or with the undue influence sometimes exercised over persons not fully capable of protecting themselves. *Boutwell* v. *Marr*, *supra*; *Plant* v. *Woods*, 176 Mass. 492; *Curran* v. *Galen*, 152 N. Y. 33; *Bohn Mfg. Co.* v. *Hollis*, 54 Minn. 223; *Casey* v. *Union*, 45 Fed. Rep. 135. The reasoning by which this view has been supported not infrequently suggests the true solution of the difficulty. The conclusion has been reached by deciding what was or was not reasonable conduct under the circumstances of the case.

The more recent authorities reason that, as the right to deal or not to deal with others is inherent in the idea of Anglo-Saxon liberty, *prima facie* a man can demand an open market; and since this is so, one who interferes with this free market must justify his acts or respond in damages. Thus far these authorities are uniform; but when they proceed to the determination of what amounts to a justification, they differ widely. The cause is not far to seek. The rule which they apply is that of reasonable conduct, yet they discuss and decide each case as though it involved only a question of law. In reality, the issue is largely one of fact, and the result is what would be expected. Judges are men, and their decisions upon complex facts must vary as those of juries might on the same facts. Calling one determination an opinion and the other a verdict does not alter human nature, nor make that uniform and certain which from its nature must remain variable and uncertain. While these cases go too far in what they decide as questions of law, yet the test they constantly declare they are applying is the true one. The standard is reasonable conduct under all the circumstances of the case. *Berry* v. *Donovan*, 188 Mass. 353; *Macauley* v. *Tierney*, 19 R. I. 255; *Doremus* v. *Hennessy*, 176 Ill. 608.

"What is the measure or test by which the conduct of a combination of persons must be judged in order to determine whether or not it is an unlawful interference with freedom of employment in the labor market, and as such injurious to an employer of labor in respect of his 'probable expectancies,' has not as yet been clearly defined. Perhaps no better definition could be suggested than that which may be framed by conveniently using that important legal fictitious person who has taken such a large part in the development of our law during the last fifty years—the reasonably pru-

dent, reasonably courageous, and not unreasonably sensitive man. Precisely this same standard is employed throughout the law of nuisance in determining what degree of annoyance . . . one must submit to." *Jersey City Printing Co.* v. *Cassidy*, 63 N. J. Eq. 759, 766.

Occasionally courts have recognized in a degree the principle that the question should be treated as one of fact. "The judge rightly left to the jury the question whether, in view of all the circumstances, the interference was or was not for a justifiable cause. If the plaintiff's habits, or conduct, or character had been such as to render him an unfit associate in the shop for ordinary workmen of good character, that would have been a sufficient reason for interference in behalf of his shopmates. We can conceive of other good reasons. But the evidence tended to show that the only reason for procuring his discharge was his refusal to join the union. The question, therefore, is whether the jury might find that such an interference was unlawful." *Berry* v. *Donovan*, 188 Mass. 353, 357.

There is no such difficulty in dealing with the question here as has been met with elsewhere, and it is not necessary to attempt to reconcile the conflict which has resulted from the application of a view which does not obtain in this jurisdiction. In this state the question of reasonable conduct, whether in relation to tangible property or to intangible rights, is one of fact. *Ladd* v. *Brick Co.*, 68 N. H. 185, and cases cited. But while the question to be settled is within the province of the jury, there are still legal propositions involved in the case. It must be determined whether there is anything for the jury to weigh—whether the evidence is not conclusive one way or the other upon the issue of reasonable conduct.

At the present time no one would think of submitting to a jury the question whether a peaceful strike for higher wages was reasonable. They would be told, as matter of law, that such action was within the laborers' rights. So there may be conduct which is clearly unreasonable, or not justifiable. An illustration of such conduct is presented by the second ground for recovery in this case. One may not interfere with his neighbor's open market or "reasonable expectancies" solely for the purpose of doing harm. It has been said, however, in several cases that a wrongful motive cannot convert a legal act into an illegal one, and many judges have thought this was the end of the law upon the question. They seem to proceed upon a theory of absolute right in the defendant, which is at variance with the holding in many of the same cases, that the defendant may be called upon to justify his conduct. Indeed, the authorities are practically unanimous to

the effect that the defendant is liable unless he shows a justification. If this is true, it follows as matter of course that his right is not absolute. It is a qualified one, and the rightfulness of its exercise depends upon all those elements which go to make up a cause for human action. The reasonableness of the act cannot always be satisfactorily determined until something is known of the state of the actor's mind. The "justification may be found sometimes in the circumstances under which it is done, irrespective of motive, sometimes in the motive alone, and sometimes in the circumstances and motive combined." *Plant* v. *Woods,* 176 Mass. 492.

Since the defendant is called upon to justify,—to show reasonable cause for the interference with his neighbor's right,—it seems to clearly follow that where his only reason is his malicious wish to injure the plaintiff, he has no justification. It is a contradiction in terms to say that a desire to do harm for the harm's sake can be called a just motive. In a late case in this state it is said of the use of property that "it cannot be justly contended that a purely malicious use is a reasonable use. The question of reasonableness depends upon all the circumstances—the advantage and profit to one of the use attacked, and the unavoidable injury to the other. Where the only advantage to one is the pleasure of injuring another, there remains no foundation upon which it can be determined that the disturbance of the other in the lawful enjoyment of his estate is reasonable or necessary." *Horan* v. *Byrnes,* 72 N. H. 93, 100.

The same reason applies here. If the evidence had been conclusive that the act was done solely from a malicious motive, a verdict would have been directed for the plaintiff. It is not improbable that there are other plain cases—cases where there is nothing for the jury to pass upon. The third issue in this case does not come within that class. It cannot be said that all reasonable men would conclude that every reasonable man would or would not do what the defendant did, even though he acted honestly and from a proper motive. If any one doubts this assertion, he has but to read the cases where this and kindred questions have been discussed and decided as those of law. *Vegelahn* v. *Guntner,* 167 Mass. 92; *Berry* v. *Donovan,* 188 Mass. 353, and cases there cited; *L. D. Willcutt & Sons Co.* v. *Driscoll,* 200 Mass. 110; *National Protective Ass'n* v. *Cumming,* 170 N. Y. 315; *Jacobs* v. *Cohen,* 183 N. Y. 207; *Wilson* v. *Hey,* 232 Ill. 389; *Barnes* v. *Union,* 232 Ill. 424. When eminent judges come to opposite conclusions upon a question, it can hardly be said that jurors might not reasonably do the same.

The plaintiff was entitled to go to the jury upon all three

grounds which have been considered : (1) Fraud, (2) malicious injury, and (3) unreasonable interference with the open market. Whether section 12, chapter 266, Public Statutes, affords a basis for a claim of greater right in the plaintiff is a question which has not been argued and is not considered.

*Exception sustained.*

All concurred.